UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LUKE FIZULICH,

          Plaintiff,

      v.                1:22-CV-1190

DWAYNE KILLINGS and
STATE UNIVERSITY OF NEW
YORK AT ALBANY,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| NESENOFF & MILTENBERG, LLP<br>Attorneys for Plaintiff<br>363 Seventh Avenue, 5th Floor<br>New York, NY 10001 | STUART BERNSTEIN, ESQ.<br>TARA JILL DAVIS, ESQ. |
| DREYER BOYAJIAN LLP<br>Attorneys for Defendant Killings<br>75 Columbia Street<br>Albany, NY 12210 | WILLIAM J. DREYER, ESQ.<br>JUSTIN QUINN DAVIS, ESQ. |
| HON. LETITIA JAMES<br>New York State Attorney General<br>Attorneys for Defendant SUNY Albany<br>The Capitol<br>Albany, NY 12224 | MARK G. MITCHELL, ESQ.<br>Assistant Attorney General |

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

### I.    INTRODUCTION

On November 14, 2022, plaintiff Luke Fizulich ("Fizulich" or "plaintiff"), a former men's basketball student-athlete, filed this civil action against defendants State University of New York at Albany ("UAlbany") and the school's men's basketball coach, Dwayne Killings ("Coach Killings" or "Killings").

Fizulich brings claims for assault, battery, and tortious interference with contract against Coach Killings.  He also alleges that UAlbany violated Title VI of the Civil Rights Act of 1964 ("Title VI") by acquiescing to a public pressure campaign and failing to adequately discipline Killings after he shoved and slapped plaintiff in the locker room before a game.

On July 14, 2025, after the parties completed discovery, UAlbany and Killings filed separate motions for summary judgment.  Dkt. Nos. 57, 58.

Both motions have been fully briefed and will be considered on the basis of the submissions without oral argument.

### II.    BACKGROUND[1]

This case stems from a November 24, 2021, incident in which Fizulich, a white student-athlete on UAlbany's men's basketball team, alleged that the team's black head coach, Killings, intentionally pushed and slapped him in a

---

[1]  The following facts are taken from a review of the parties' statements of material fact, plaintiff's responses to those filings, and from relevant record materials.  They are viewed in the light most favorable to plaintiff, the non-movant.

2

locker room before a game, in front of teammates and other coaches. Pl.'s Resp. to SUNY's Statement of Material Facts ("SOMF"), Dkt. No 64-33 at 1 ¶ 2; *id.* at 14 ¶ 9; SUNY's Resp. to Pl.'s Counterstatement, Dkt. No. 67-3 at 4 ¶ 9.

On Sunday, February 27, 2022, Fizulich reported the incident to UAlbany. Dkt. No. 64-35 at 9. Plaintiff sat down the following day, Monday, February 28, 2022, to discuss it with senior UAlbany athletics staff. *See* Dkt. No. 58-10 at 3–4 ("Thank you for meeting with me and my family this morning. [I] trust that you have begun your inquiry and I expect to receive word from you by close of business on Wednesday, March 2, 2022. If I do not hear from you by this date, my family and I will need to take matters into our own hands and use whatever means necessary in order to achieve our desired outcome.").

That same week, UAlbany's Director of Employee Relations Brian Selchick ("Director Selchick"), along with Assistant Director of Employee Relations Keiffer Peralta ("Assistant Director Peralta"), began investigating the incident alleged by Fizulich. Selchick Decl., Dkt. No. 58-2 ¶ 12. Coach Killings was placed on an alternative assignment during this period of time. *See id.*

Between March 1, 2022, and March 14, 2022, Director Selchick and Assistant Director Peralta interviewed Fizulich and several witnesses. All of these witnesses largely corroborated Fizulich's allegations of a battery. *See, e.g.*, Selchick Interview Notes, Dkt. No. 64-34 at 3 (coaching staff member "did not see [a] shove," "remembers [Killings] making contact with Luke's face," says "[t]eam was caught off guard."); *id.* at 4 (second coaching staff member

3

"could clearly see [the] incident" and "describe[d] the physical contact as a smack in the face."); *id.* at 8 (teammate "describe[d] the slap as more than a tap—slap was audible," says Killings later told team "he smacked Luke as a[n] energy tactic—to hype [them] up"); *id.* at 12 (second teammate described "the slap []as hard and not a 'pat'"); *id.* at 13 (third teammate "confirmed he saw [Killings] slap Luke across the face," spoke with Fizulich after and described plaintiff as "angry and embarrassed").

On March 15, 2022, Director Selchick and Assistant Director Peralta met with Coach Killings to question him directly about the incident. *See* Peralta Interrogation Notes, Dkt. No. 64-35. Coach Killings "stated his intent was [to] grab [Fizulich] behind [the] neck/shoulder area and bring him into his chest in a hug-like maneuver" but Fizulich "moved which inadvertently resulted in a slap across [Fizulich's] face." *Id.* at 6.

Assistant Director Peralta's notes for the March 15 meeting with Coach Killings include a reminder for Director Selchick and him to "[m]ake the following points:"

1. Advise that we will keep the interrogation open while we review the responses provided. Then meet privately with management to confirm or deny the decision to suspend or return as well as next steps/settlement position, if any.

2. In your case, our investigation has led us to conclude that you violated the University's Workplace Violence Policy and engaged in serious misconduct. Accordingly, we have determined there is probable cause that your continued presence on the job presents a potential danger to the campus community and would severely interfere with University operations.

4

3. Advise Dwayne Killings that he will be suspended without pay unless he chooses to resign.  Point out the advantages of a resignation, i.e., no disciplinary record in file, neutral reference, etc.  Would you like to discuss this option with your [union] representative?

4. If Dwayne Killings refuses to consider a stipulation of settlement, serve him with the suspension letter and advise him that we will serve him with a Notice of Discipline within ten (10) days.

Peralta Interrogation Notes, Dkt. No. 64-35 at 9–10.

Thereafter, at an undated meeting "[s]ometime [] between March 16th and April 1st," Director Selchick, Assistant Director Peralta, and other UAlbany representatives met with Coach Killings and his representatives to, as Selchick put it, "discuss the potentiality of a resolution."  Selchick Depo., Dkt. No. 58-7 at 80.

Director Selchick recalls that UAlbany was "willing, at the time, to . . . discuss what [Coach Killings'] ideas and proposals were."  Selchick Depo., Dkt. No. 58-7 at 80.  "We were really there more so to listen.  And after conferring with the president's office at the time, we were willing to let him resign."  *Id.* at 80; *id.* at 81 ("Q: Did you or anyone else [at the meeting] make any recommendations as to whether he should accept a resignation? [] A: I suggested that he resigned [*sic*].  Q: Why did you suggest that?  A: Because it's always easier when the employee who's the subject to discipline resigns.  You don't have to go through an arbitration.  You don't have to, you know, potentially do a settlement agreement.  It's — if you're the employer, it's — it's ideal.").

Coach Killings and his representatives, however, were "[v]ehemently opposed," and felt that "he shouldn't have to resign[.]"  Selchick Depo., Dkt. No. 58-7 at 81, 82; *see also id.* at 82–83 ("And the lobbyist was adamant that, you know, Coach Killings has done a lot for the community, that he's really involved with the school, and with at-risk youth in the area.  [H]e moved his family here, et cetera, and that they didn't think that was reasonable."); *id.* at 83 ("Q: Was there any discussion in this meeting about the fact that he was the first African American head coach [of] the men's basketball team at the University?  A: No.").

The meeting ended without a consensus.  *See* Selchick Depo., Dkt. No. 58-7 at 83 ("We left with, 'We'll go back and have conversations, you know, about options on our side.'  'We would like for you' — meaning the other side — 'to consider our options as well.'  They didn't seem to be particularly interested in that.  And we said we'd get back to them."); *see also id.* Dkt. No. 58-7 at 83–84 ("Q: Did you relay any of the information that was shared in this meeting with the president of the University?  A: I – I think just the outcome, but I don't recall.  I – I know I didn't give like a play by play.").

Meanwhile, outside of the confidential investigation and these closed-door discussions, public rumors swirled about UAlbany's plans for Coach Killings.  On March 28, 2022, an anonymous social media user who posted under the alias "@samurai_hoops" tweeted "Per Samurai Sources, Dwayne Killings will be relieved of his duties at Albany following the Final Four.  Albany AD

6

Mark Benson reportedly going to give Killings an opportunity to depart on his own." Dkt. No. 64-15 at 2. This social media thread continued: "AD Mark Benson has reportedly given [Coach] Killings the opportunity to leave on his own in an attempt to salvage the situation but has openly beg[u]n his search for a replacement." Dkt. No. 64-15 at 3.

Some community members—particularly those in the local black community—heard similar rumors or already harbored suspicions of the university's intentions. Central among them was a man named Marcus Pryor, president of Peter M. Pryor Associates. Dkt. No. 64-30 at 2. Pryor mounted his own campaign to support Coach Killings.

At around 3:00 pm on March 29, 2022, Pryor texted a UAlbany administration contact:

> I think it's about to go nuclear. It's my understanding that it's going to happen at 4. I'm being asked to start reaching out to the next level. This isn't good, and is about to get really ugly. I'm hoping you can give me something to slow things down. [President] Havidan [Rodríguez] is about to bring a world of drama to the University that he doesn't want. I have a group of Black leaders that was going to request a meeting with him. If [Killings] is fired before he speaks with them, that's going to be truly detrimental.

Dkt. No. 64-17 at 24. Receiving no response, at about 4:20 pm, Pryor messaged again: "FYI, I contacted the President's office to request a meeting." *Id.* at 24. This elicited a reply from the UAlbany contact: "I'm in meetings now, I tried to

7

talk to [President Rodríguez] but he is not interested . . . he said we have a process . . . very, very frustrating." *Id.* at 24.

On Wednesday, March 30, 2022, Pryor received the following text from another individual: "Hearing UAlbany will drop the news Monday afternoon." Dkt. No. 64-28 at 2.  Pryor responded, "There's been huge movement in the last couple hours." *Id.* at 2.

On Thursday, March 31, 2022, Pryor "le[d] a panel of community leaders supporting University at Albany men's basketball head coach Dwayne Killings[.]" Times-Union Article, Dkt. No. 64-18 at 3; *see also* WAMC Article, Dkt. No. 64-19 at 3 ("While the probe continues, a coalition of Albany area leaders pledged their support today.  [B]usiness and civil rights leaders spoke Thursday at the Fort Orange Club in support of the coach while calling on UAlbany to be more transparent about the investigation.").

Local news outlets also entered the fray.  For instance, the Albany Times-Union reported: "'The community is really concerned about what's going on here with this particular issue,' Dr. Alice Green, executive director of The Center for Law and Justice, said.  'We are not being given the information about this process, so we're very confused and concerned.'"  Times-Union Article, Dkt. No. 64-18 at 4.  "'Those gathered see Killings as a bridge between the community, particularly the Black community, and UAlbany,' said Marcus Q. Pryor, an Albany native and businessman.  'This is more than just about one man.'"  Times-Union Article, Dkt. No. 64-18 at 4.

8

The local coverage continued. "Pryor says Killings is still employed at the college." WAMC Article, Dkt. No. 64-19 at 4. "Pryor requested a meeting with UAlbany president Havidan Rodriguez on Tuesday, and said his understanding is that Rodriguez is currently traveling." *Id.* at 5. "Pryor sent Rodriguez another letter following the statement clarifying that he's not asking the school to discuss private student matters or share personnel information, but rather that the school 'listen to what we have to say' regarding Killings' impact on the community." Times-Union Article, Dkt. No. 64-18 at 5–6.

On Friday, April 1, 2022, Director Selchick sent Fizulich an email entitled "Final Determination." Dkt. No. 58-10 at 6. Director Selchick informed plaintiff that the investigation "resulted in a finding that substantiates [that] [Coach] Killings had inappropriate physical contact with you on November 24, 2021[.]" *Id.* at 6. "Given the substantiation[,] the University is taking appropriate corrective action with respect to the subject employee." *Id.* at 6.

Ultimately, UAlbany's President, Dr. Havidán Rodríguez, determined that Coach Killings would remain employed but would be subject to disciplinary sanctions. Pl.'s Resp. to SUNY SOMF, Dkt. No. 64-33 at 4 ¶ 16. Accordingly, on April 1 or 2, 2022, the University and Killings executed an agreement they refer to as a "settlement." *Id.* at 4 ¶ 16.

This "settlement" agreement provided that Coach Killings would undergo training, submit a written apology to UAlbany, receive a five-game

9

suspension and letter of reprimand, and pay a $25,000 fine to charities of the university's choosing. Pl.'s Resp. to SUNY SOMF, Dkt. No. 64-33 at 4 ¶ 17.

In the fall of 2022, Fizulich, dissatisfied with UAlbany's decision to retain the coach that had assaulted him, decided not to continue playing for the UAlbany men's basketball team. Fizulich transferred to the College of New Jersey. Pl.'s Resp. to SUNY SOMF, Dkt. No. 64-33 at 8 ¶ 30.

On November 14, 2022, Fizulich filed this suit. *See* Compl., Dkt. No. 1.

## III.  **LEGAL STANDARD**

Under Rule 56, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674, 686 (2d Cir. 2023) (internal citation omitted). A fact is "material" if "it might affect the outcome of the suit under the governing law[.]" *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 82 F.4th 161, 170 (2d Cir. 2023).

In reviewing the motion, the district court must "draw all reasonable inferences against the party whose motion is under consideration." *Suluki v. Credit One Bank, NA*, 138 F.4th 709, 719 (2d Cir. 2025). However, "[a] question of material fact does not exist merely because the plaintiff disagrees with the deposition  testimony  and  documentary  evidence  produced  by  the

10

defendant[s]." *Andrade v. Cultural Care, Inc.*, 706 F. Supp. 3d 348, 355 (E.D.N.Y. 2023).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts[.]" *Felton v. Monroe Cmty. Coll.*, 747 F. Supp. 3d 603, 616 (W.D.N.Y. 2024) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

Rather, the nonmovant "must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Michel v. Yale Univ.*, 110 F.4th 551, 560 (2d Cir. 2024) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

## IV.   **DISCUSSION**

Fizulich's operative complaint alleges a Title VI race discrimination claim against UAlbany[2] and state-law claims for assault and battery and tortious interference against Coach Killings. *See* Am. Compl., Dkt. No. 17 ¶¶ 76–

---

[2]  Fizulich's breach-of-contract claim against UAlbany was previously dismissed.  Dkt. No. 29 at 12.

11

115. In plaintiff's view, UAlbany discriminated against him on the basis of his race by giving Coach Killings preferential treatment despite the fact that Killings assaulted him. According to plaintiff, UAlbany initially decided to fire Coach Killings for this misconduct but reversed that decision after pressure from activists and donors. *See, e.g.*, Pl.'s Resp. to SUNY, Dkt. No. 64 at 15, 17.

In other words, Fizulich's claim against UAlbany hinges on a factual assertion: that the school allegedly reversed course (*i.e.*, initially decided to fire Coach Killings but relented to public pressure).[3] *See, e.g.*, Pl.'s Resp. to SUNY, Dkt. No. 64 at 5 ("[T]he University changed course and reversed its decision to terminate Killings[:] In so doing, the University discriminated against Fizulich, a white student, in favor of Killings, a black employee, amounting to a violation of Title VI."); *id.* at 15 ("The decision to reverse the termination was based on Killings' race . . . resulting in intentional discrimination against Fizulich."); *see also id.* ("A jury could reasonably infer that Albany's inconsistent decisions are . . . evidence of pretext.").

Thus, as an initial matter, the question is whether there is a genuine dispute of fact on this issue. In support of his assertion that UAlbany reversed an internal decision to fire Coach Killings, Fizulich submits a March 28, 2022, social media post from an anonymous Twitter user under the alias "Samurai

---

[3] This assertion actually hinges on two, related facts: *first,* that the school allegedly reversed course (*i.e.*, initially decided to fire Coach Killings but relented to public pressure), and, *second*, that there was something improper or impermissible about that change of decision. The second question implicates whether and to what extent UAlbany's policies might have cabined its discretion. Those polices are discussed in more detail *infra.*

Hoops," which claims that "per Samurai Sources, Dwayne Killings will be relieved of his duties at Albany[.]" Dkt. No. 64-15 at 2. In addition, Fizulich cites a November 16, 2022, email sent to plaintiff's counsel from someone using the alias "Northern Man," which alleges that "Alice Green and Charles Touhey . . . threatened to pull a large promised donation to UAlbany if the firing of Killings was not reversed." Dkt. No. 64-16 at 2.

Fizulich offers these anonymous, unsupported social media posts and the e-mail as evidence that UAlbany initially decided to fire Coach Killings but later reversed course based on public pressure. Although these anonymous submissions might be relevant evidence for some other purpose, the Court cannot consider these posts or the e-mail as affirmative evidence on the issue of UAlbany's internal decision-making for the purpose of assessing the motions for summary judgment.

It is beyond cavil that a plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment[,] absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985). Fizulich has not made any

13

such showing for either anonymous message.[4]  Accordingly, they are not admissible evidence on the issue of UAlbany's internal deliberations and will not be treated as such.

Beyond these anonymous statements, Fizulich's remaining citations to the record likewise fail to support the claimed reversal by UAlbany.  Most are self-referential in nature; they merely point to earlier instances in which Fizulich himself repeated the same unsubstantiated assertion.  *See, e.g.*, Pl.'s Resp. to SUNY SOMF, Dkt. No. 64-33 at 16 ¶ 29 ("Albany . . . reversed the decision to terminate[.]  The decision to reverse the termination was purely based on race.") (citing Am. Compl. ¶ 59); *but see* Am. Compl., Dkt. No. 17 ¶ 59 ("*Upon information and belief,* Defendant SUNY Albany . . . reversed the decision to terminate[.]") (emphasis added); *see also, e.g.,* Pl.'s Resp. to SUNY SOMF, Dkt. No. 64-33 at 7–8 ¶ 26 ("Based on Plaintiff's knowledge, Killings was terminated and rehired following pressure from local civil rights leaders.") (citing "Fizulich Tr. at 220–221"); *but see* Pl.'s Depo., Dkt. No. 58-4 at 221 ("Q: Are you claiming that Dwayne Killings was terminated, you know, his employment was terminated, and then, he was rehired?  A: Yeah, I *believe* so.") (emphasis added).

---

[4] The identity of the social media user is not in the record, so there is no basis on which to assess whether the anonymous user had any personal knowledge about the assertions that were made.  Likewise, Fizulich testified that he does not know who "Northern Man" is or whether there is any basis for the allegations in the email. *See* Pl.'s Depo., Dkt. No. 58-4 at 225 ("Q: Who is Northern Man?  A: Some anonymous source, anonymous email.  Q: Did you ever talk to him?  A: I don't believe we ever got in contact with him besides this initial email.  Q: [D]o you know what, if anything, the allegations in this email are based on?  A: This is all I know about this.  We reached out and not—or nothing.  A: Besides this email, is — is there any other information or documents or evidence you're relying on to say that there was a — a threat to pull a — pull a donation or financial support if Killings was terminated?  A: No, nothing that we haven't already mentioned.").

Notably, however, Fizulich's own testimony in this litigation demonstrates that he *also* lacks any personal knowledge of an alleged reversal by UAlbany. *See* Pl.'s Depo., Dkt. No. 58-4 at ("Q: [I] want to direct your attention in that paragraph to the statement that upon information and belief, Defendant's SUNY Albany decided to terminate Defendant Killings on March 27, 2022. [W]ho told you that? A: [Director] [B]rian Selchick. Q: [O]kay. And it was Mr. Selchick who told you that SUNY had determined that he [*sic*] was going to terminate . . . Coach Kelly [*sic*]. That's your testimony? A: I don't remember if he said that at that time. Q: Well, when did he say it? A: I don't recall when he said it. Q: Do you recall that he did say it? A: I don't want to speak to that because I don't know if he said that to me on the phone so. Q: All right. Well, I don't want to beat a dead horse so to speak but whether it's on the phone or in some other venue or context in words or substance, did Selchick tell you that the university had determined that it was going to terminate Coach Killings? A: Selchick told me that he didn't believe what [Killings] said and that the next steps were going to be taken. That's all I remember him saying to me on the phone. So I can't speak to anything else."); *see also id.* ("That's just my conversations and information with Brian Selchick. It was also in articles and it was publicly said at the time that he was going to be terminated. Q: All right. So you relied on newspaper articles? A: That's where I read it.").

15

Again, self-serving statements—made without any personal knowledge of the school's internal deliberations—are not a substitute for admissible proof on this issue. "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602.

To that end, "publicly available news stories do not create individualized knowledge." *New Jersey Carpenters Health Fund v. Residential Cap., LLC*, 2013 WL 6839093, at *4 (S.D.N.Y. Dec. 27, 2013); *Rizvi v. Town of Wawarsing*, 654 F. App'x 37, 39 (2d Cir. 2016) (summary order) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.") (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009)).

The remainder of Fizulich's cited evidence point only to statements by Pryor, the outside community leader, who harbored the strong (but also apparently subjective) belief that Coach Killings would be fired. *See* Pl.'s Resp. to SUNY, Dkt. No. 64 at 14 ("Confirming that the University's initial decision was to terminate Killings, [P]ryor sent a series of text messages . . . which referred to Pryor's understanding that Killings was going to be terminated from Albany at 4:00 pm [on March 29, 2022]. [S]imilarly, on a date prior to March 31, 2022, Pryor sent a text message in a group chat, stating 'the University is moving to terminate coach, and we're trying to get ahead of them.'").

16

Upon review, nothing in the record supports the notion that Pryor was involved in, privy to, or otherwise possessed any personal knowledge of UAlbany's internal decision-making process, either. "No matter how frequently or adamantly plaintiff repeats it, that conclusory assertion . . . finds no support in this record." *Butler v. New Paltz Cent. Sch. Dist.*, 2026 WL 849925, at *12 (N.D.N.Y. Mar. 27, 2026).

In short, even viewed in the light most favorable to him, Fizulich's contention that UAlbany "reversed" some initial, internal decision to fire Coach Killings in response to public pressure is unsupported by the available record. Indeed, aside from plaintiff's citations to various sources suggesting otherwise (which all lack personal knowledge, as explained *supra*), the available internal notes from the investigation indicate that disciplinary measures short of termination were on the table from the very beginning of the investigation. *See, e.g.,* Peralta Interrogation Notes, Dkt. No. 64-35 at 9–10. Accordingly, the assertions offered by plaintiff that have been made without any showing of personal knowledge will not be considered for purposes of summary judgment.

### A. Title VI Claim against UAlbany

Fizulich's operative complaint alleges that UAlbany racially discriminated against him, a white student-athlete, by favoring Coach Killings, a black school employee, when it refused to terminate the coach despite concluding that he had assaulted plaintiff in the locker room.

17

Typically, "[t]o state a claim for Title VI discrimination, a plaintiff must allege that the defendant discriminated against h[im] on the basis of race, color, or national origin; the discrimination was intentional; and the discrimination was a substantial or motivating factor for the defendant's actions." *Eldars v. State Univ. of N.Y. at Albany*, 2021 WL 4699221, at *4 (2d Cir. Oct. 8, 2021) (summary order) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001)).

As explained above, Fizulich's Title VI race discrimination claim against UAlbany boils down to this: the public rumor mill suggested that UAlbany was going to fire Coach Killings.  Killings is black; plaintiff is white.  Pryor, an outside community member, along with a group of local civil rights leaders, donors, and representatives of Coach Killings, made public statements about the racial contrast presented by the incident (and perhaps even emphasized it for public purposes).

In plaintiff's view, UAlbany's internal decision-making vis-à-vis Coach Killings's discipline must also have hinged on that racial distinction.  Thus, according to plaintiff, by not firing Coach Killings, the university discriminated against Fizulich based on plaintiff's race.  In other words, Fizulich claims that UAlbany did not fire Killings because Fizulich is white.

### 1. Disparate Treatment

"Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*,

18

702 F.3d 655, 664 (2d Cir. 2012) (citing 42 U.S.C. § 2000d). "Public educational institutions that receive federal funds are subject to this mandate." *Zeno*, 702 F.3d at 664 (internal citations omitted). "Title VI prohibits intentional violations of the statute." *Id.* "In certain circumstances, courts view actions of a third party as intentional violations by the funding recipient itself." *Id.* (noting harassment of student by teacher or peer may result in school district liability for intentional discrimination) (collecting cases).

As the Court noted in a prior round of motion practice in this case, none of Fizulich's race-discrimination allegations "fit[s] neatly into a Title VI analysis[.]" Opinion & Order, Dkt. No. 29 at 9. In the educational setting, "[t]o meet the burden of establishing a *prima facie* case of discrimination under Title VI, a plaintiff m[ay] show, through direct or indirect evidence, that: '(1) []he is a member of a protected class; (2) []he suffered an adverse action in pursuit of h[is] education by defendant; (3) []he was treated differently from similarly situated students who are not members of the protected class; and (4) []he was qualified to continue in h[is] educational pursuit.'" *Williams v. Pace Univ.*, 192 F. Supp. 3d 415, 422 (S.D.N.Y. 2016) (quoting *Koumantaros v. City Univ. of New York*, 2007 WL 840115, at \*8 (S.D.N.Y. Mar. 19, 2007)); *see also* Pl.'s Resp. to SUNY, Dkt. No. 64 at 10 (citing *Williams*, 192 F. Supp. 3d at 422) (same).

Fizulich asserts that he "was treated differently from other students who are not members of his protected class because Albany deviated from its own

19

policies in [his] case, while consistently applying those policies to others outside his protected class." Pl.'s Resp. to SUNY, Dkt. No. 64 at 11.

As relevant here, UAlbany's "Campus and Workplace Prevention" policy stresses "[t]he University's commitment to zero tolerance of workplace violence[.]" Campus & Workplace Violence Prevention Policy, Dkt. No. 63-30 at 2. According to plaintiff, the University "failed to apply that mandate here[] when it permitted Killings to retain his position[.]" Pl.'s Resp to SUNY, Dkt. No. 64 at 16.

This argument is unavailing. To be sure, in certain cases a school's handbook or policy can create binding obligations. *See Ford v. Rensselaer Polytechnic Inst.*, 507 F. Supp. 3d 406, 413 (N.D.N.Y. 2020) ("'[S]pecific promises . . . in a school's bulletins, circulars[,] and handbooks, which are material to the student's relationship with the school,' are enforceable.") (quoting *Keefe v. N.Y. Law School*, 71 A.D.3d 569 (1st Dep't 2010)).

But the UAlbany policy identified by plaintiff is not one of them. It is clear that the policy's "zero tolerance" language is only generalized rhetoric that does not express or imply any self-binding obligation on UAlbany. Nothing in the policy commands any particular sanction. Nor does any language in the policy mandate termination. *See* Campus & Workplace Violence Prevention Policy, Dkt. No. 63-30 at 4 ("Any individual who makes a threat, exhibits threatening behavior or engages in violent acts on University property may be subject to removal from the premises as quickly as safety permits, pending the

20

outcome of an investigation, and/or civil or criminal prosecution as appropriate.") (emphases added); *id.* at 5 ("Any employee or representative . . . who believes that a serious violation of a workplace violence protection program exists . . . shall bring such matter to the attention of University Police and the Office of Human Resources Management in the form of a written notice.  [T]he offices shall coordinate an investigation, and resolution."); *id.* at 6 ("Any student who believes that a serious violation of this Policy and Program exists or that an imminent danger exists shall bring such matter to the attention of University Police, the Office of Human Resources Management, and the Office of Student Success in the form of a written notice.  [T]he offices shall coordinate an investigation, and resolution."); *id.* at 6 ("Every supervisor is obligated to report any knowledge of such conduct to the Office of Human Resources immediately.  Failure of a supervisor to investigate and initiate appropriate action may result in administrative action up to and including discipline.") (emphasis added); *id.* at 8 ("Retaliatory action against anyone acting in good faith who has made a complaint of workplace violence, who has reported witnessing workplace violence, or who has been involved in reporting, investigating, or responding to workplace violence is a violation of this policy.  Those found responsible for retaliatory action will be subject to discipline up to and including termination.").

Title VI requires that a "plaintiff must show, through direct or indirect evidence, that . . . []he was treated differently from similarly situated students

21

who are not members of [his] protected class[.]" *Williams*, 192 F. Supp. 3d at 422. But Fizulich's opposition papers offer only this: "Plaintiff was treated differently from other students who are not members of his protected class because Albany deviated from its own policies in Plaintiff's case, while consistently applying those policies to others outside his protected class." Pl.'s Resp. to SUNY, Dkt. No. 64 at 11.

This is fundamentally conclusory. If the "policies" to which Fizulich has gestured in this section are meant to include the Campus & Workplace Violence Prevention Policy just discussed above, his argument fails for the reasons already provided. As for any other "policies," that vague label is too broad to analyze in a meaningful fashion, so it does not support Fizulich's Title VI claim.

Even if the Court were inclined to look past this imprecision to try to make heads or tails out of what other "policies" at UAlbany not only created a binding obligation to a student-athlete but also covered coach-on-student-athlete assault claims, this Title VI claim still cannot be analyzed under Fizulich's own proffered framework.

22

For instance, plaintiff does not even provide a hint of the identity of a potential comparator.[5]  And the Court's independent review of the record reveals none.  *See, e.g.*, Pl.'s Depo., Dkt. No. 58-4 at 228 ("Q: Are you claiming you were treated worse, that you were discriminated against as compared to other students who are not white?  A: There was nobody else in a similar situation as me, if that's what you're asking.").

In sum, even viewed in the light most favorable to Fizulich, the non-movant, no rational fact-finder could side with plaintiff on his Title VI claim for disparate treatment against UAlbany.  Accordingly, UAlbany is entitled to summary judgment on this claim.

### 2.  Hostile Education Environment[6]

Although Fizulich's disparate treatment claim fails, a plaintiff "may establish a prima facie case of discrimination in a number of different ways

---

[5] The University maintains in its SOMF: "Plaintiff conceded that he was not treated worse than similarly situated students who were not white."  Dkt. No. 58-18 ¶ 40 (citing Fizulich Tr. 255–56).  Plaintiff's response disputes this.  Dkt. No. 64-33 ¶ 40 ("Plaintiff denies this statement.  *See* Fizulich Tr. 225:19–22 ('Q: Are you claiming UAlbany treated you differently from similarly situated students who are not white? A. Yes.').").  True, Lines 19–21 on the cited page of Fizulich's testimony consist of the question "Are you claiming UAlbany treated you differently from similarly situated students who are not white?"  *See* Pl.'s Depo., Dkt. No. 58-4.  And Line 22 contains Fizulich's single-word answer: "Yes."  *Id.*  However, Fizulich later submitted an errata sheet, wherein he identifies that Line 22 of page 225—his single-worded answer "Yes"—"should be stricken" as "questions/answer were clarified later, answer was changed."  Pl.'s Depo., Dkt. No. 58-4 at 288.  Accordingly, plaintiff provides no valid citation to the record putting the fact in dispute, and it is deemed admitted.  Regardless, even had Fizulich not amended his answer, he fails to identify any student-of-color comparator.

[6]  Fizulich's operative complaint mentions, in passing, UAlbany's "deliberate indifference."  *See* Am. Compl. Dkt. No. 17 ¶ 72 ("As a result, [Fizulich's] dreams of playing basketball in college and pursuing a career in basketball in Europe are shattered, all stemming from the violent and vicious assault by Defendant Killings' and Defendant SUNY Albany's deliberate indifference to Fizulich because of his race."); id. ¶ 73 ("Fizulich has been trying to deal with the emotional toll of . . . Defendant SUNY Albany's deliberate indifference[.]").  Deliberate indifference is a necessary element of plaintiff's hostile educational environment claim.  *See, e.g.*, *Daly ex rel. Daly v. Miller Place Union Free Sch. Dist.*, 2025 WL 3470167, at *8 (E.D.N.Y. Dec. 3, 2025) (collecting cases).

depending on the specific facts of a given case[.]" *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (Title VII claim).  As relevant there, the Second Circuit cautioned that it is not required that a plaintiff *always* be able to show disparate treatment of an otherwise similarly situated student as a necessary prerequisite to a prima facie case.  *Cf. McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (Title VII claim).

Against this backdrop, a reader could understand Fizulich as attempting to allege that UAlbany created a hostile educational environment in violation of Title VI.  *See, e.g.,* Am. Compl., Dkt. No. 17 ¶ 100 ("Fizulich was forced to play under conditions that were unbearable, effectively excluding him from participation in his beloved sport and denying him the benefits that brought him to SUNY Albany in the first place."); ¶ 104 ("Fizulich[] ha[d] no other rational choice but to leave SUNY Albany[.]"); Pl.'s Resp. to SUNY, Dkt. No. 64 at 10 ("Fizulich faced a difficult decision—remain in a hostile environment or forgo the opportunity to play basketball at the collegiate level[.]").

Such a "Title VI [] claim . . . requires a student to plead, and eventually prove, that: (1) []he was subject to severe or pervasive harassment; (2) the harassment was motivated, at least in part, by h[is] race, color, or national origin; (3) the institution had both actual knowledge of the harassment and the ability to exercise substantial control over the harasser[]; (4) the institution was deliberately indifferent to the harassment; and (5) the harassment deprived the student of educational benefits or opportunities that []he was otherwise

24

entitled to." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art,* 765 F. Supp. 3d 245, 259 (S.D.N.Y. 2025), *reconsideration denied sub nom. Gartenberg v. Cooper Union for Advancement of Sci. & Art,* 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025).

Even viewed in this generous light, Fizulich's Title VI claim against UAlbany would also fail. For starters, plaintiff's claim is a poor fit for the general legal rubric that applies to Title VI hostile educational environment claims. Fizulich does not even argue that Coach Killings harbored any racially discriminatory animus toward him.

Rather, Fizulich argues that UAlbany *itself* harassed plaintiff on the basis of his race because it decided not to discipline Coach Killings in a particular manner, *i.e.*, UAlbany did not fire him. *See, e.g.*, Pl.'s Resp. to SUNY, Dkt. No. 64 at 18 ("[T]he discrimination in this case arose from Albany's own conduct, as opposed to third-party harassment[.]"); *id.* at 5 ("[T]he University discriminated against Fizulich, a white student[,] amounting to a violation of Title VI."); *id.* at 5 ("[B]ecause Albany discriminated against Plaintiff, its own conduct put it on notice of [his] Title VI claim.").

This argument must be rejected. Nothing in the record suggests that any individual's race—let alone Fizulich's race—played any role whatsoever in UAlbany's decision with respect to Coach Killings one way or another. Indeed, plaintiff has not offered any record evidence tending to suggest that UAlbany even took any action with respect to him in particular. Instead, plaintiff

25

voluntarily transferred to another school after UAlbany completed its investigation and disciplined Coach Killings.

In sum, even viewed in the light most favorable to Fizulich, the non-movant, no rational fact-finder could side with plaintiff on his Title VI claim for a hostile educational environment against UAlbany. Accordingly, UAlbany is entitled to summary judgment on this claim.

**B. State Law Claims against Coach Killings**

Fizulich's remaining causes of action are state-law claims against Coach Killings for assault, battery, and tortious interference with contract. Since Fizulich's Title VI claim has been dismissed, the only remaining basis for federal-court jurisdiction is diversity of citizenship between the parties. *See* 28 U.S.C. § 1332.

As an initial matter, Coach Killings argues that the remainder of this action must be dismissed because plaintiff has not satisfied the amount-in-controversy requirement needed to sustain federal-court jurisdiction.

"In considering whether a plaintiff has met his burden of satisfying the jurisdictional amount requirement, courts recognize 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'" *Franklin v. Liberty Mut. Ins., Co.*, 2010 WL 5758984, at *2 (S.D.N.Y. Oct. 22, 2010) (quoting *WoldeMeskel v. Vocational Instruction Project Cmty. Servs., Inc.,* 166 F.3d 59, 63 (2d Cir. 1999)).

"To overcome the presumption, the defendant must show 'to a legal certainty that the amount recoverable does not meet the jurisdictional threshold.'" *Franklin*, 2010 WL 5758984, at \*2 (quoting *Scherer v. Equitable Life Assur. Soc'y, U.S.,* 347 F.3d 394, 397 (2d Cir. 2003)).

Coach Killings asserts that Fizulich's physical injuries and his emotional and psychological injuries are, respectively, "at best in the 0 to four-figure range[.]" Killings's Mot. Summ. J., Dkt. No. 57-21 at 24–25. He also maintains that "[h]ere, one isolated [incident] is insufficient . . . to support a finding of punitive damages." *Id.* at 25.

Coach Killings may prove right on each front after a trial on the merits. But he has not shown to a legal certainty that the amount in controversy would necessarily fall below the requisite threshold. Accordingly, the Court has jurisdiction over plaintiff's state-law claims.

### 1. Tortious Interference with Contract

"[T]he elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 646 N.Y.S.2d 76, 82 (N.Y. 1996)).

27

Fizulich has offered few details about any contract between himself and UAlbany—beyond repeatedly maintaining that one (or possibly more) existed. *See* Pl.'s Resp. to Killings, Dkt. No. 63 at 13 ("[Killings] had every reason to be aware of the implied contract between Plaintiff, as a student-athlete, and Albany."); Pl.'s Resp. to Killings, Dkt. No. 63 at 12 ("Killings had knowledge of Fizulich's contractual relationship with the University by nature of his position as Head Coach[.]") (citing Killings Tr. at 47:14–17); Pl.'s Resp. to Killings, Dkt. No. 63 at 11 ("[T]here is a question of fact as to whether Killings' wrongful conduct . . . induced a breach of Albany's contract with Plaintiff."); Pl.'s Am. Compl. ¶ 87 ("At all relevant times, Defendant Killings had knowledge of Fizulich's contractual relationship with the University and knew Fizulich was a student enrolled at the University and a member of SUNY Albany's Basketball program.").

As noted above, in certain circumstances an implied contract can exist between a student and an institution of higher education. *See Ford*, 507 F. Supp. 3d at 413–14 (collecting cases). But that does not save this claim, because plaintiff "cannot maintain [his] tortious interference with contract claim without adequately alleging an underlying breach." *Kirschner v. CIHLP LLC*, 2017 WL 4402545, at *7 (S.D.N.Y. Sept. 30, 2017) (citing *Kirch*, 449 F.3d at 401).

"Under New York law, it is insufficient, for purposes of stating a viable claim for tortious interference with contract, to allege in conclusory terms that

28

a contract existed and was breached." *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 2018 WL 1273343, at \*11 (S.D.N.Y. Mar. 5, 2018); *see Bennett v. State Farm Fire & Cas. Co.*, 137 A.D.3d 731, 731 (2d Dep't 2016) (dismissing tortious interference claim where plaintiffs "fail[ed] to plead the terms of the alleged underlying contract between the[m] and [the third party], and any specific breach thereof"); *Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*, 80 A.D.3d 453, 454 (1st Dep't 2011) ("[P]laintiff has failed to state . . . a [tortious interference with contract] claim[;] [h]e has not alleged, in nonconclusory language, the essential terms of the . . . contract, including the specific provisions upon which liability is predicated."); *see also DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 534 (E.D.N.Y. 2011) ("[P]laintiffs failed to plead either a breach of express contract or a breach of implied contract because they failed to allege the essential terms of the parties' purported contract in nonconclusory language, including the specific provisions of the contract upon which liability is predicated.") (internal citations and alterations omitted).

The most Fizulich provides is this: "Plaintiff's tortious interference claim is based on the premise that Killings' intentional assault disrupted him from continuing his education at Albany and prevented [Fizulich] from participating in the Men's Basketball program." Pl.'s Resp. to Killings, Dkt. No. 63 at 12. "Killings' actions . . . induced Albany to breach its contract with Plaintiff, when

the University failed to enforce its 'zero tolerance' policy against violence on campus." *Id.* at 15.

As before, Fizulich points to UAlbany's Campus and Workplace Violence Prevention Policy and Program (the "Violence Prevention Policy" or "Policy") in support of this claim. Pl.'s Resp., Dkt. No. 63 at 14 (citing Am. Compl. ¶¶ 63–64, 109). In doing so, Fizulich cites *Rynasko v. New York University*, 63 F.4th 186, 197 (2d Cir. 2023), for the proposition that "specific promises set forth in a school's bulletins, circulars and handbooks, which are material to the student's relationship with the school, can establish the existence of an implied contract[.]" *See* Pl.'s Resp., Dkt. No. 63 at 14.

True, the Violence Prevention Policy "sets forth standards for all members of the campus community"—including students, who are bound to it. *See* Dkt. No. 63-30 at 2; *id.* at 6 ("[s]tudents shall adhere to this Policy and Program[.]"). Under the Policy, "[n]o person may engage in violent conduct or make threats of violence, implied or direct, on University property or in connection with the University business or workplace." *Id.* at 2. "This includes but is not limited to . . . any unwanted contact such as hitting, fighting, pushing[.]" *Id.*

In fact, the policy emphasizes UAlbany's ostensible lack of tolerance for violence. *See, e.g.*, Dkt. No. 63-30 at 2 ("The University will not tolerate any act or threat of violence made on University property, or while in work status at a workplace."); *id.* at 2 ("Pursuant to the University's commitment to zero

30

tolerance of workplace violence, the University adopts the following as its Workplace Violence Prevention Program[.]").

But, as relevant here, the policy does little to bind UAlbany, let alone to specifically bind it to any promise to plaintiff. Instead, the policy requires only that UAlbany *investigate* a reported violation. *See, e.g.*, Dkt. No. 63-30 at 6 ("Any student who believes that a serious violation of this Policy and Program exists or that an imminent danger exists shall bring such matter to the attention of University Police, the Office of Human Resources Management, and the Office of Student Success in the form of a written notice. Following a written notice, the offices shall coordinate an investigation, and resolution.").

The policy does not demand UAlbany enforce any specific remedy in response to any specific violation. Indeed, the only mention of the possibility of an employee's termination is in discussing retaliation against complainants, witnesses, or anyone else connected with responding to an incident. *See* Dkt. No. 63-30 at 8 ("Those found responsible for retaliatory action will be subject to discipline up to and including termination."); *see also id.* at 6 ("Failure of a supervisor to investigate and initiate appropriate action may result in administrative action up to and including discipline."); *id.* at 4 ("Any individual who makes a threat, exhibits threatening behavior or engages in violent acts on University property may be subject to removal from the premises as quickly as safety permits, pending the outcome of an investigation, and/or civil or criminal prosecution as appropriate.").

31

Fizulich insists that framing his tortious interference claim "as stemming from Albany's decision not to terminate Killings" is "erroneous[.]"  Pl.'s Resp. to Killings, Dkt. No. 63 at 14.  But Fizulich's characterization merely rearranges words—arriving at what is, in essence, the same place.

Fizulich "allege[s] that it was implicit in his contractual relationship and expressly provided by Albany's policies, that students like him are promised a safe environment in their continued education and participation in programs like Albany's Men's Basketball team."  *Id.* at 14.

But by Fizulich's telling, the basketball team was unsafe precisely *because* Coach Killings was not fired.  *See* Pl.'s Counterstatement to SUNY SOMF, Dkt. No. 64-33 ¶ 33 ("By reversing the decision to terminate Defendant Killings, Fizulich was forced to play under conditions that were unbearable, effectively excluding him from participation in his beloved sport and denying him the benefits that brought him to Albany in the first place.").

Fizulich asserts that "Albany [] breach[ed] its contract with [him] when the University failed to enforce its "zero tolerance" policy against violence on campus."  Pl.'s Resp. to Killings, Dkt. No. 63 at 15.  In his opinion, the only way UAlbany could enforce this policy was by firing Killings.  *See* Pl.'s Depo., Dkt. No. 58-4 at 229 ("Q: So is it your view that termination of his employment was the only appropriate response to your complaint?  A: Yes.").

Fizulich is wrong, at least as far as state common law is concerned.  It is undisputed that UAlbany *investigated* and disciplined Coach Killings.  *See*

32

Dkt. No. 63-33 at 16 ¶ 16; *id.* at 9 ¶ 30. By the explicit terms of the Violence Prevention Policy relied on by plaintiff, that was all the school was required to do. Fizulich has failed to identify any plausible breach of the Violence Prevention Policy under these circumstances, let alone sufficient disputed facts to warrant a trial on that issue. Accordingly, his state-law claim for tortious interference must be dismissed.

### 2. Assault & Battery

Under New York law, civil assault "is defined as intentionally placing another in fear of imminent harmful or offensive contact[.]" *Dougherty v. Weinert,* 809 N.Y.S.2d 758, 758–59 (1st Dep't 2005) (citing *United Natl. Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 2d Cir. 1993)).

Coach Killings argues Fizulich's civil assault claim should also be dismissed because Fizulich "never expected to be hit." Killings Resp., Dkt. No. 57-21 at 12. "Fizulich testified to paying attention to Killings, and then suddenly getting hit with an open hand." *Id.*; *see id.* ("I was looking at him, everyone was looking at him, you know, head coach. And he pushed me into the locker, and he smacked me in the face with an open hand.") (quoting Fizulich Depo, Dkt. No. 57-5 at 73).

According to Coach Killings, "[n]o reasonable person could believe that harmful contact was imminent here because there was insufficient time between the beginning of Killings' motion and the end result of contact being made for Fizulich to conceptualize fear." Killings Resp., Dkt. No. 57-21 at 12.

This argument must be rejected. As Fizulich argues, a "reasonable person [c]ould fear harmful contact if they were suddenly pushed up against a locker." Pl.'s Resp. to Killings, Dkt. No. 63 at 9. Thus, triable issues of fact preclude summary judgment on Fizulich's civil assault claim.

"To recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, i.e., wrongful under all of the circumstances, and intent to make the contact without the plaintiff's consent." *M. P. v. Wilson*, 2026 WL 886278, at \*1 (2d Dep't. Apr. 1, 2026) (quoting *Higgins v. Hamilton*, 18 A.D.3d 436, 436 (2d Dep't. 2005)).

Coach Killings goes on to argue that Fizulich's civil battery claim warrants dismissal "because Killings' intentions were pure[.]" Killings Resp., Dkt. No. 57-21 at 11; *id.* at 12 ("Whatever the end result, Killings' intentions to motivate UAlbany's Great Danes to victory through joint celebration is not actionable at this posture."). Coach Killings also contends that he intended only "to pull Fizulich into him to excite the team before an important game." Killings Resp., Dkt. No. 57-21 at 11.

However, Coach Killings concedes that he "made open-handed contact, with his right hand, to the left side of Fizulich's face." Killings SOMF, Dkt. No. 57-20 ¶ 14. A genuine issue of material fact exists as to whether Killings intentionally slapped Fizulich, precluding summary judgment for Killings on Fizulich's civil battery claim. *See* Killings SOMF, Dkt. No. 57-20 ¶ 15; Pl.'s Resp. to Killings SOMF, Dkt. No. 63-33 ¶ 15.

34

## V.    CONCLUSION

Fizulich's Title VI claim against UAlbany must be dismissed.  The record evidence establishes that UAlbany investigated Coach Killings in accordance with its policies after plaintiff lodged a complaint.  Ultimately, UAlbany took meaningful disciplinary action against Coach Killings with a letter of reprimand, required him to undergo training, submit a written apology, sit through a five-game suspension, and pay a $25,000 fine.  Aside from public speculation, plaintiff has not offered any basis on which to conclude that race played a role in this series of events.

Fizulich's tortious-interference claim against Coach Killings must also be dismissed because he cannot establish that UAlbany breached any contract with him, let alone show how Coach Killings might have intentionally procured that breach without justification.  After all, it is undisputed that UAlbany investigated and disciplined Coach Killings in accordance with the explicit terms of its Violence Prevention Policy.

However, plaintiff's assault and battery claims against Coach Killings involved disputed issues of fact and remain for trial.

Therefore, it is

ORDERED that

1.  Defendant State University of New York at Albany's motion for summary judgment (Dkt. No. 58) is GRANTED;

35

2.  Plaintiff Fizulich's Title VI claim (Count III) against defendant State University of New York at Albany is DISMISSED;

3.  Defendant State University of New York at Albany is DISMISSED as a defendant from this action;

4.  Defendant Dwayne Killings's motion for summary judgment (Dkt. No. 57) is GRANTED IN PART and DENIED IN PART;

5.  Plaintiff Fizulich's tortious-interference claim (Count II) against defendant Dwayne Killings is DISMISSED; and

6.  Plaintiff Fizulich's assault and battery claims (Count I) against defendant Dwayne Killings will proceed to trial.

IT IS SO ORDERED.

_____
David N. Hurd
U.S. District Judge

Dated:  June 10, 2026
          Utica, New York.

36